United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF DR. MARTIN BOOMER, JR., et al.,<br>Plaintiffs,<br>v.<br>CITY OF OAKLAND, et al.,<br>Defendants. | Case No. 26-cv-07445-WHO<br><br>**ORDER ON MOTIONS TO DISMISS**<br>Re: Dkt. Nos. 5, 25 |

In this case, plaintiffs, representatives of the Estate of Dr. Martin Boomer, Jr. ("Dr. Boomer") allege that defendants California Highway Patrol ("CHP"), the City of Oakland, the Oakland Police Department ("OPD"), the State of California, and Does 1-100 engaged in a high-speed chase through the streets of Oakland that led to the death of Dr. Boomer and significant injuries to his partner, Ta Ta Neshe Woodruff ("Woodruff"). CHP, the City of Oakland, and the OPD now move to dismiss plaintiffs' complaint for failure to state a claim under Federal Rule 12(b)(6). I agree that the complaint does not allege enough facts that would give rise to each cause of action raised by the plaintiffs. But further amendment may ultimately make them plausible. Defendants' motions to dismiss are GRANTED with leave to amend.

## BACKGROUND

### I. Factual Background

The facts of this case are nothing short of tragic. I take all plausible allegations as true at this stage of the proceeding. *Al Saud v. Days*, 50 F.4th 705, 709 (9th Cir. 2022).

#### A. The Pursuit and Accident

On May 28, 2025, at around 7:30 p.m., CHP officers identified an Infiniti G35 (the "vehicle") at 102nd Avenue and International Boulevard in Oakland, California, that they "believed to be connected to a prior felony evasion incident involving the Alameda County

Sheriff's Office." Complaint ("Compl.") [Dkt. No. 1-1] ¶¶ 64–65. The vehicle was owned by defendant Gabina Hernandez Garcia ("Gabina") and was being driven at the time by her son, defendant Eric Scott Hernandez Garcia ("Hernandez Garcia"). *Id.* ¶ 69. Hernandez Garcia was driving the vehicle without Gabina's permission. *Id.* CHP reported that the vehicle "allegedly displayed no license plates and was believed to be a stolen vehicle." *Id.* ¶ 68. When CHP approached the vehicle, Hernandez Garcia drove away, initiating a pursuit. *Id.* ¶ 67.

The initial pursuit lasted 37 seconds before CHP officers terminated direct ground pursuit and began monitoring Hernandez Garcia via CHP aircraft and patrol surveillance. *Id.* ¶ 70. Approximately 15 minutes after the initial contact, Hernandez Garcia stopped the vehicle around Lake Merritt, roughly one mile from the eventual crash site. *Id.* ¶ 72. Hernandez Garcia "partially exited and/or fully exited the vehicle" after stopping. *Id.* ¶ 73. CHP officers following Hernandez Garcia "arrived at that location, exited their patrol vehicles, approached [him], and attempted to detain him." *Id.* ¶ 74. The officers were unsuccessful in their attempt; Hernandez Garcia reentered the vehicle and continued fleeing from the officers. *Id.* ¶¶ 75–77.

CHP discontinued direct ground pursuit for a second time, instead opting for "coordinated aerial monitoring, tactical surveillance, visual tracking, and following activities through CHP aircraft and patrol units." *Id.* ¶ 79. Hernandez Garcia continued driving until he approached the intersection of East 21st Street and 12th Street in Oakland's San Antonio neighborhood, traveling between 80 to 100 miles per hour. *Id.* ¶¶ 5, 8, 83. Moments later, Hernandez Garcia's vehicle "struck a fire hydrant with catastrophic force," which "violently crashed into Dr. Boomer and [his partner] Ms. Woodruff as they walked innocently along the sidewalk near their home." *Id.* ¶¶ 9, 114. The vehicle then "struck a tree and/or additional fixed objects and ignited." *Id.* ¶ 115.

"[P]ortions of the shared fire hydrant and associated debris struck Dr. Boomer and caused or substantially contributed to his fatal injuries." *Id.* ¶ 10. Prior to the crash, Dr. Boomer pushed Woodruff "away from the path of the oncoming vehicle," saving her life. *Id.* ¶ 11. But Woodruff was not left unscathed; she "sustained catastrophic orthopedic, neurological, cognitive, emotional, and psychological injuries, including traumatic brain injury, permanent pain, emotional devastation, and severe psychological trauma that continue to affect every aspect of her life." *Id.* ¶



United States District Court
Northern District of California

12.

Despite Woodruff's injuries, the CHP officers who arrived to the crash site "initially detained, questioned, or treated [her] as a possible suspect or participant in the incident," despite knowing or having reason to know she was an "injured civilian victim in need of immediate medical and psychological assistance." *Id.* ¶ 13. Plaintiffs accordingly allege that Woodruff was "effectively abandoned and ultimately forced to seek assistance from civilians rather than from the officers[.]" *Id.* ¶ 14.

**B. The Sinkhole**

The complaint maintains that prior to the collision, "East 21st Street and surrounding corridors were widely known by residents, community members, and public officials as dangerous areas associated with excessive speeding, reckless driving, sideshow activity, roadway deterioration, and pedestrian safety concerns." *Id.* ¶ 53. "Residents repeatedly complained to the City concerning roadway safety hazards in the area, including the Sinkhole located at East 21st Street between 11th and 13th avenues[.]" *Id.* ¶ 54. They "submitted complaints, maintenance requests, public warnings, and/or 311 reports concerning roadway defects, dangerous speeding, and hazardous conditions near the collision site." *Id.* ¶ 55. They also placed "warning cones and informal warnings near or within the roadway defect after the City failed to adequately address the danger." *Id.* ¶ 57. The complaint alleges that the City of Oakland's failure to "reasonably inspect, repair, warn against, barricade, or otherwise mitigate the roadway hazard" created a substantial and foreseeable risk of this accident from occurring in the neighborhood. *Id.* ¶¶ 61–62.

**C. CHP Pursuit Policies**

Plaintiffs also allege that the CHP "maintained pursuit policies requiring officers to continuously evaluate public safety risks associated with vehicular pursuits." *Id.* ¶ 162. They believe that CHP violated such policies by "failing to safely detain the suspect when opportunities existed," "continuing and/or reinitiating pursuit under unsafe conditions," "ignoring known roadway and pedestrian hazards," and "failing to meaningfully terminate the pursuit." *Id.* ¶ 163.

**II. Procedural History**

Plaintiffs originally filed their complaint in the Superior Court of California, County of

United States District Court
Northern District of California

Alameda, on May 28, 2026. *See* Compl. Plaintiffs brought nine causes of action: (1) wrongful death of Dr. Boomer, (2) negligence, (3) dangerous condition under Cal. Gov. Code § 835, (4) state created danger under 42 U.S.C. § 1983, (5) deliberate indifference under 42 U.S.C. § 1983, (6) *Monell* liability under 42 U.S.C. § 1983, (7) violation of the Bane Act, California Civil Code § 52.1, (8) intentional infliction of emotional distress, and (9) permissive use under California Vehicle Code § 17150. Service of the summons and complaint was effectuated on June 17, 2026, and CHP removed the case to federal court on July 17, 2026.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleadings was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

*Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

## I. OAKLAND'S MOTION TO DISMISS

### A. Section 1983 Claims

Most of plaintiffs' claims against the City of Oakland and the OPD (together, "Oakland") arise from purported violations of 28 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must plausibly allege two elements: (1) that a right secured by the Constitution or laws of the United States were violated; and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Oakland moves to dismiss plaintiffs' Section 1983 claims on four independent grounds. It first argues that the OPD cannot be considered a "person" for the purpose of a Section 1983 claim. Oakland Mot. at 11. I disagree with that assertion, but agree with Oakland's other arguments. Plaintiffs have not adequately alleged its state-created danger claim in Count IV. *Id.* at 6. Count V, alleging deliberate indifference and failure to render aid, is inapplicable considering that the plaintiffs were not in custody at the time of the accident. *Id.* at 6–8. Count VI, the *Monell* claims, are inadequately pleaded. *Id.* at 8–10. I address each issue below.

#### 1. "Person"

The first point of contention concerns the scope of Section 1983's coverage. Oakland argues that municipal departments, including the OPD, are not "persons" for the purpose of a Section 1983 claim. *Id.* at 11. I disagree.

Ninth Circuit authority appears split on the issue. Oakland points to *United States v. Kama*, 394 F.3d 1236 (9th Cir. 2005), as instructive. *See id.* *Kama* concerned a motion to return marijuana seized from the plaintiff by the United States Drug Enforcement Agency. Oakland cites Judge Ferguson's concurrence in support of his argument, as he noted that "municipal police departments and bureaus are generally not considered 'persons' within the meaning of 42 U.S.C. § 1983." *Id.* at 1239–40 (Ferguson, J., concurring) (citing *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995)). Plaintiffs conversely argue that *Duarte v. Stockton*, 60 F.4th 566 (9th Cir. 2023), suggests that "longstanding precedent establishes that both California municipalities and police



United States District Court
Northern District of California

departments are 'persons' amenable to suit under § 1983." 60 F.4th at 568. While Oakland acknowledges in its reply brief that *Duarte* stands for the general proposition that municipal departments may be subject to suit in federal court, such allegations require independent facts concerning the police department or municipality. Oakland Repl. at 8. Here, Oakland maintains, plaintiffs have provided no allegations distinguishing between the City of Oakland and the OPD's conduct, and "courts routinely dismiss police departments as duplicative defendants where the claims against a city and its police department arise from the same facts." *Id.* (quoting *Mann v. City of Chula Vista*, No. 18-cv-2525-WQH-MDD, 2020 WL 5759749, at *3 (S.D. Cal. Sept. 28, 2020)).

Plaintiffs have plausibly alleged a distinction between the City of Oakland and the OPD's conduct. Plaintiffs' allegations against the City of Oakland are rooted in its purported failure to take "reasonable protective measures to address the dangerous Sinkhole and roadway hazards despite prior notice, foreseeability, and known risks to public safety." Compl. ¶ 245. By contrast, the complaint alleges that the OPD failed to "render timely and appropriate aid [to Woodruff]; fail[ed] to adequately secure and manage the collision scene; fail[ed] to protect Ms. Woodruff; fail[ed] to appropriately attend to Dr. Boomer's body, treating injured victims in an unreasonable and punitive manner; and otherwise acting with deliberate indifference toward Plaintiffs' serious medical and emotional needs." *Id.* ¶ 246. While these allegations arise from the same chain of events, they focus on different allegations and purported failures by the parties. Under the logic of *Duarte* and *Mann*, Oakland and the OPD are not duplicative defendants at the pleading stage. I decline to dismiss plaintiffs' Section 1983 claims on this theory. But it is still necessary for plaintiffs to state a claim, which they have not done.

**2. State-Created Danger (Count IV)**

Generally speaking, there is no affirmative right under the Fourteenth Amendment to governmental aid. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Two exceptions exist for this rule: (1) the special-relationship exception and (2) the state-created danger exception. *Martinez v. High*, 91 F.4th 1022, 1028 (9th Cir. 2024). Count IV of the complaint asserts a state-created danger against Oakland, the Oakland Police Department ("OPD"), the State of California,

and CHP. *See* Compl. ¶¶ 205–28. To prevail on such claim, a plaintiff must establish (1) "affirmative actions of the official placed the individual in danger he otherwise would not have faced," (2) that "the danger was known or obvious," and (3) that "the officer acted with deliberate indifference to that danger." *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012).

Oakland argues that the "body of [this] claim addresses only CHP's pursuit of Hernandez Garcia," and that plaintiffs do not allege that the OPD "pursued Hernandez Garcia or took any affirmative action that exposed Plaintiffs to a foreseeable danger that they would not otherwise have faced." Oakland Mot. at 6. Plaintiffs concede this point, but they contend that leave to amend is appropriate to allow "pleading allegations regarding OPD's post-collision conduct as a distinct state-created-danger claim, expressly separated from the pursuit-based allegations directed principally at CHP, the State, and the pursuit-related DOE defendants." Oakland Oppo. at 16. I agree with plaintiffs that leave to amend is warranted. Accordingly, the state-created-danger claim is DISMISSED with regard to the City of Oakland and OPD with leave to amend.

**3. Deliberate Indifference / Failure to Render Aid (Count V)**

Both parties agree that the Due Process Clause of the Fourteenth Amendment generally does not impose an affirmative obligation or duty on a government entity to protect individuals from third-parties or to provide medical assistance. *See Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–97 (1989). What the parties disagree on is how this applies to instances where a government entity *has* provided some level of affirmative conduct: If the entity later changes course, does that constitute a state-created danger?

Oakland says the answer is "No." In its view, the law is clear that the government only has a duty to protect citizens or provide medical assistance in cases where an individual is in custody, or when the individual alleges a state-created danger, "which . . . does not exist here." Oakland Mot. at 6–7 (citing *Deshaney*, 489 U.S. at 195–97; *Sinclair v. City of Seattle*, 61 F.4th 674, 679–80 (9th Cir. 2023)). Applying this standard, Oakland argues that the OPD owed no duty to Woodruff because they had not placed her in custody at the time of the accident. *Id.* Moreover, with respect to the City of Oakland's liability, Oakland maintains that "a road hazard such as a pothole or sinkhole affecting all members of the public equally is not a particularized danger to Plaintiffs"

United States District Court
Northern District of California

that would implicate Fourteenth Amendment concerns. *Id.* at 8.

Plaintiffs disagree with both arguments. First, with respect to the OPD's conduct, plaintiffs argue that *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), is instructive. In *Penilla*, an elderly man on his porch became seriously ill, requiring a passerby to call 911 for emergency medical services. *Id.* at 708. Two city police officers arrived to the house prior to the paramedics, found him to be in "grave need of medical care," but ultimately cancelled the passerby's call for paramedics. *Id.* Instead, the officers broke the door of the man's residence, moved him inside the house, locked the door, and left. *Id.* Family members later found the man dead on the floor inside his house the next day. *Id.* The decedent's estate brought an action against the City of Huntington Park, its police departments, and the individual officers, alleging various violations of Section 1983. *Id.*

On the question of deliberate indifference, the Ninth Circuit panel noted that the "officers in this case allegedly took affirmative actions that significantly increased the risk facing [the man]: they cancelled the 911 call to the paramedics; they dragged Penilla from his porch, where he was in public view, into an empty house; they then locked the door and left him there alone. And they allegedly did so *after* they had examined him and found him to be in serious medical need." *Id.* at 710. While the court recognized the cause of the man's death remained disputed and undeveloped in the record, the officers' conduct "clearly placed [him] in a more dangerous position than the one in which they found him," as placing him behind a locked door made it "impossible for anyone to provide emergency medical care to [him]." *Id.*

Applying *Penilla*, plaintiffs assert that the OPD officers "treated an obviously injured Ms. Woodruff as a suspect, questioned her while she remained untreated, exercised investigatory authority, control, direction, and restraint that limited her ability to seek assistance, ordered her away despite her visible impairment, and affirmatively interfered with her access to timely emergency care." Oakland Oppo. at 13 (citing Compl. ¶¶ 136–43, 237–40, 246). In their view, these actions plausibly arise to deliberate indifference under Section 1983; as in *Penilla*, "official conduct made an acutely ill or injured person less able to obtain aid than she had been before the officers intervened." *See id.*

Unlike in *Penilla*, however, the complaint does not allege that Ms. Woodruff's symptoms were directly worsened *because* of the officers' questioning; instead, it notes that the officers "increased her vulnerability to further physical injury, emotional trauma, psychological harm, and abandonment." Compl. ¶ 239. The Ninth Circuit in *Penilla* explicitly recognized that it was the officers' affirmative conduct – placing the man behind a locked door, making treatment impossible and thereby contributing to his death – that formed a cognizable deliberate indifference claim. Nothing in the complaint here arises to that level of affirmative conduct or causation.

With respect to the City of Oakland, plaintiffs argue that "the danger [they] allege is not the Sinkhole in isolation," but the "confluence of the City's un-remediated hazard with CHP's ongoing pursuit, which foreseeably drove a fleeing vehicle into precisely that location." Oppo. at 15. In other words, "Dr. Boomer and Ms. Woodruff were not abstract members of the public who might someday happen upon the Sinkhole; they were specific, identifiable pedestrians present on the sidewalk immediately adjacent to a known hazard at the exact moment the hazard was struck by a vehicle CHP had repeatedly failed to safely apprehend." *Id.*

Plaintiffs cite *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), in support of their position. In *Hernandez*, plaintiffs, attendees of a rally in support of President Trump's 2016 campaign, sued the City of San Jose Police Department alleging deliberate indifference after officers "directed them to walk through anti-Trump protestors, rather than allowing them to turn south, in the direction of safety" despite their knowledge that such rallies often "spurred violent anti-Trump protests" and despite the City's "normal . . . 'zero tolerance' approach to violent protestors." *Id.* at 1129–30 (cleaned up). Plaintiffs asserted that after following these instructions, they were "struck repeatedly in their faces and heads" by anti-Trump protestors. *Id.* at 1130. Plaintiffs also alleged that the "Officers looked on" as they were attacked, but "did nothing" to assist them. *Id.*

On appeal, a Ninth Circuit panel found that plaintiffs had plausibly alleged their deliberate indifference claim. *Id.* at 1133–37. The court first found that the Officers "greatly increased that risk of violence when they shepherded and directed the Attendees towards the unruly mob waiting outside the Convention Center," which constituted an affirmative act. *Id.* at 1134. It then noted

that because "the Officers . . . were aware of the danger to the plaintiffs—they knew the anti-Trump protestors posed an immediate threat to the Attendees," but ultimately failed to take reasonable measures to protect the plaintiffs, the Police Department "act[ed] with deliberate indifference" to the danger. *Id.* at 1136.

Dr. Boomer asserts that *Hernandez* held that "a danger directed at an identifiable group rather than the public generally is particularized," and that the "danger here was particularized to the discrete class of persons present at that specific location during CHP's pursuit—a class that, tragically, included Dr. Boomer and Ms. Woodruff." Mot. at 15. Because his theory of liability against the City of Oakland is "not the Sinkhole in isolation," but the "confluence of the City's un-remediated hazard with CHP's ongoing pursuit," Dr. Boomer maintains that whether "that combination . . . suffices to establish liability is a question for a developed factual record, not a pleading-stage dismissal." *Id.*

The allegations Dr. Boomer raises against the City of Oakland do not rise to the level indicated in *Hernandez*. In *Hernandez*, the officers committed an affirmative act. The City's conduct was not remotely similar. Dr. Boomer's allegations regarding the City of Oakland are speculative and tenuous: he maintains that the City likely had knowledge that pedestrians would face an increased likelihood of injury or death as a result of a car crashing into the sinkhole during an "ongoing pursuit" with the CHP, or that OPD officers would fail to render aid to those individuals after discovering them. Oppo. at 15. He does not state a claim of deliberate indifference.

Accordingly, Oakland's motion to dismiss plaintiffs' deliberate indifference claim as to both the OPD and the City of Oakland is GRANTED with leave to amend.

**4. *Monell* Liability (Count VI)**

Plaintiffs' final cause of action arising under Section 1983 asserts that the City of Oakland and the OPD are liable under *Monell v. Department of Social Services* for its policies and customs that "inflect[ed] the injury" in question. *See* 436 U.S. 658 (1978). To state a claim under *Monell*, a plaintiff must establish: "(1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom or practice; (3) that the policy, custom or

practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom or practice was the moving force behind the constitutional violation." *Torres v. Saba*, No. 17-cv-06587-SI, 2019 WL 111039, at *6 (N.D. Cal. Jan. 4, 2019), *aff'd*, 816 F. App'x 143 (9th Cir. 2020). Under this standard, an eligible "policy, custom, or practice" may include "written policies, unwritten customs and practices, [and] failure to train municipal employees on avoiding certain obvious constitutional violations[.]" *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021). A municipality may be liable where its "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . ." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Generally, "[a] pattern of similar constitutional violations by untrained employees is . . . necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks and citation omitted).

The City of Oakland argues that plaintiffs have only provided "formulaic recitations of the elements of a *Monell* cause of action," which is insufficient to defeat its 12(b)(6) challenge. Oakland Mot. at 9; *see Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1149 (E.D. Cal. 2009) (finding that where a "complaint does not identify what the training and hiring practices were, how the training and hiring practices were deficient, or how the training and hiring practices caused [p]laintiffs' harm," such "threadbare" allegations are insufficient). Plaintiffs respond by pointing to paragraphs 253, 257, and 258 of the complaint. Oakland Oppo. at 17–18. Paragraph 253 charges the OPD with various "unconstitutional policies, customs, practices, ratification, failures to train, failures to supervise, and deliberate indifference," including:

> (a) failing to adequately train officers regarding vehicle pursuits, pursuit initiation, pursuit continuation, pursuit termination procedures, and public safety considerations during pursuits; (b) failing to adequately supervise, monitor, discipline, and evaluate officers engaged in vehicle pursuits; (c) maintaining a culture, policy, and/or practice of indifference toward public safety during pursuits and at collision scenes; (d) encouraging, tolerating, condoning, and/or ratifying conduct inconsistent with OPD's then-existing pursuit policies and constitutional obligations; (e) failing to adequately train officers concerning emergency medical response, treatment of victims, scene security, and post-collision management; and (f) through statements, directives, policy advocacy, and conduct by OPD command staff, including the Chief of Police and supervisory

> personnel, actively promoting more aggressive pursuit practices and encouraging officers to disregard, circumvent, minimize, or undermine existing pursuit restrictions in an effort to pressure policymakers and the City Council to loosen pursuit limitations then in effect.

Compl. ¶ 253. Plaintiffs also allege that at the time of the incident, "OPD's pursuit policy was materially more restrictive than the policy later adopted, and OPD leadership was publicly advocating for expanded pursuit authority despite the known, foreseeable, and substantial danger that high-speed pursuits posed to innocent motorists, pedestrians, and the public at large." *Id.*

Paragraph 257 similarly notes that the OPD "maintained customs, policies, practices, and/or failures to train concerning emergency medical response, treatment of victims, rendering of aid, post-collision scene management, victim protection, and interactions with injured civilians, resulting in deliberate indifference toward Plaintiffs' serious medical and emotional needs following the collision." *Id.* ¶ 257. Plaintiffs conclude in Paragraph 258 that such "unconstitutional customs, policies, practices, failures to train, failures to supervise, ratification, and deliberate indifference by Defendants were substantial factors and proximate causes of Plaintiffs' injuries and damages, including but not limited to the severe physical injuries, pain and suffering, emotional distress, trauma, wrongful death damages, financial losses and loss of companionship, care, comfort, protection, affection, guidance, and society." *Id.* ¶ 258.

The paragraphs identified by plaintiffs are less "threadbare" than the ones identified in *Young*. *See* 687 F. Supp. 2d at 1149. They allege specific constitutional violations and identify the City of Oakland and the OPD's policies, customs, or practices, *see id.* ¶ 253, and indicate that such practices amounted to deliberate indifference, *id.* ¶¶ 257–58. But plaintiffs have not sufficiently identified how such "policy, custom or practice was the moving force behind the constitutional violation." *Torres*, 2019 WL 111039, at *6. Many of the identified policies and practices, including "deficient pursuit policies," are inapplicable to the City of Oakland or the OPD because the complaint does not allege the City's involvement in the pursuit.

Similarly, plaintiffs' allegations concerning the OPD's emergency medical response and post-collision conduct are insufficient. Plaintiffs generally allege that OPD maintained deficient policies and practices concerning emergency response and treatment of victims of accidents, *see*



United States District Court
Northern District of California

Compl. ¶ 257, but they do not identify any facts plausibly showing that an OPD policy or practice caused the constitutional deprivations alleged. Plaintiffs' conclusory assertion that the policies were "substantial factors and proximate causes" of their injuries does not supply that missing causal connection. *See id.* ¶ 258.

Because plaintiffs have not sufficiently pleaded their *Monell* claim, I will GRANT the City of Oakland's motion to dismiss this claim with leave to amend.

**B. Bane Act**

Count VII asserts violations of California's Bane Act, Cal. Civ. Code § 52.1. "The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation or coercion." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation and quotation marks omitted). "Claims under section 52.1 may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims." *Id.* at 1040–41.

The City of Oakland alleges that plaintiffs' complaint "fails to identify a single specific utterance or act by the City that could constitute a threat of violence or coercion," as the Bane Act is "intended to address only *egregious* interferences with constitutional rights, not just any tort," *Shoyoye v. Cnty. of L.A.*, 203 Cal. App. 4th 947, 958–59 (2012) (emphasis added). Oakland Mot. at 10. Oakland notes that while the complaint alleges that "Defendants exercised coercive police authority and control over Ms. Woodruff" when she was later questioned for an investigation, those allegations are conclusory and, at a minimum, do not show that OPD or Oakland "threatened or intimidated Ms. Woodruff and prevented her from exercising any constitutional right." *Id.* at 10–11 (quoting Compl. ¶¶ 265–66).

Plaintiffs respond that the complaint sufficiently alleges that "the challenged exercise of police authority over Ms. Woodruff interfered with [her due process interests in freedom from affirmative governmental conduct that creates or increases a known, particularized medical danger] by increasing her vulnerability and impeding her ability to obtain timely medical assistance." Oakland Oppo. at 20 (citing Compl. ¶¶ 137–41, 237, 239, 266–68). They note that

United States District Court
Northern District of California

the complaint alleges "intentional conduct, not an accidental administrative error," and that these actions plausibly raise allegations of a Bane Act violation. *Id.* at 20–21.

Plaintiffs' complaint alleges that Woodruff was "visibly and obviously injured, bleeding, disoriented, emotionally traumatized, concussed, physically injured, and in need of immediate emergency medical assistance following the collision." Compl. ¶ 261. Despite this, defendants "failed and refused to render timely and reasonable medical aid, protection, assistance, comfort, and emergency care," instead treating her as a "potential suspect, investigative subject, witness of suspicion, and/or person of interest." *Id.* ¶¶ 262–63. Defendants then questioned Woodruff while visibly injured and unable to protect her own interests and advocate for medical treatment. *Id.* ¶ 265. The complaint emphasizes that defendants "exercised coercive police authority and control" over her during this questioning, and that Woodruff "reasonably perceived that she was subject to police authority, direction, control, intimidation, and coercive pressure and was not free to disregard officers' conduct, leave the scene safely, or independently seek protection and medical assistance[.]" *Id.* ¶¶ 266–67. Plaintiffs conclude that defendants' conduct "went beyond mere negligence and constituted reckless, intentional, malicious, oppressive, coercive, and conscious disregard for Ms. Woodruff's constitutional and statutory rights." *Id.* ¶ 272. Instead, defendants "interfered, and attempted to interfere, through threats, intimidation, coercion, abuse of official authority, deliberate indifference, and misuse of police power, with Ms. Woodruff's rights[.]" *Id.* ¶ 273.

These allegations are long on rhetoric and short on facts. They do not show *how* the City of Oakland and OPD's conduct amounted to "interference. . . carried out by threats, intimidation or coercion." *Reese*, 888 F.3d at 1040 (citation and quotation marks omitted). Should plaintiffs wish to proceed on this claim, they must be more specific. I grant the City of Oakland's motion to dismiss with leave to amend.

## II. CHP'S MOTION TO DISMISS

CHP moves to dismiss plaintiffs' complaint on three theories. It first argues that Section 17004 of the California Vehicle Code provides immunity for any alleged conduct arising from its officers' chase of Garcia Hernandez. CHP Mot. at 5–6. CHP also maintains that the Fourteenth

Amendment does not provide an affirmative right to governmental aid under these circumstances. *Id.* at 6–7. Finally, like the City of Oakland, CHP contends it is not a "person" for purposes of plaintiffs' Section 1983 claims. *Id.* at 7–8. I agree.

**A. "Person"**

Plaintiffs concede in their opposition that the CHP is not a "person" for the purpose of a Section 1983 claim. *See* CHP Oppo. at 17–18. But they do not believe this requires dismissal with prejudice. Instead, plaintiffs note that the complaint identifies "DOES 1 through 100 and expressly alleges that Plaintiffs do not yet know their true names and will amend once those identities are ascertained." *Id.* at 18 (citing Compl. ¶ 18). Plaintiffs cite the Ninth Circuit's holding in *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980), as showing that when the identity of individual government defendants are unknown prior to filing a complaint, the plaintiff should "receive an opportunity through discovery to identify them unless it is clear that discovery would not reveal their identities or that the underlying claims fail for some independent reason." *Id.* Accordingly, because state officials are "persons" for Section 1983 purposes, plaintiffs conclude that leave to amend, rather than dismissal of the Section 1983 claims, is appropriate.

I agree with plaintiffs that leave to amend is appropriate to determine whether they can plausibly allege misconduct by individual CHP officers who would quality as "persons" under Section 1983. Plaintiffs' Section 1983 claims (Counts IV and V) are DISMISSED with respect to the CHP with leave to amend.

**B. Wrongful Death and Negligence (Counts I and II)**

CHP additionally argues that plaintiffs' wrongful death (Count I) and negligence (Count II) claims should be dismissed because the CHP is immune from liability. Both parties agree that Section 17004 of the California Vehicle Code applies to this dispute but disagree over its interpretation. Section 17004 states, in relevant part:

> A public agency employing peace officers that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits . . . is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor



United States District Court
Northern District of California

> vehicle by a peace officer employed by the public entity.

Cal. Veh. Code § 17004.7(b)(1).

CHP asserts that "Section 17004 immunity is absolute," and that "officers are immune even if the pursuit involved negligent or intentional conduct." CHP Mot. at 5 (citing *Cruz v. Briseno*, 22 Cal. 4th 568, 572 (2000) (finding Section 17004 "clear and unambiguous in immunizing public employees" from injuries during pursuits); and *Hernandez v. City of Pomona*, 46 Cal. 4th 519, 519 (same)). Dr. Boomer responds by arguing that *Cruz* and *Hernandez* only address individual officer liability, a different provision of Section 17004, whereas this case focuses on the actions of the CHP as an agency. CHP Oppo. at 10–11. "Establishing that individual officers may be immune under section 17004 does *not* establish that the employing public entity has satisfied the independent statutory prerequisites for section 17004.7 immunity," Dr. Boomer concludes. *Id.* at 11 (emphasis in original).

Dr. Boomer is correct. "Vehicle Code section 17004.7 is part of a broader statutory scheme determining whether public entities may be liable under California law." *Ramirez*, 14 Cal. App. 5th at 817. Section 17001 provides that "[a] public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment." Cal. Veh. Code § 17001. Section 17004.7, in turn, "limits the liability that section 17001 otherwise permits by affording immunity to public agencies that adopt and implement appropriate vehicle pursuit policies." *Ramirez*, 14 Cal. App. 5th at 818. "Subdivision (c) sets forth 12 specific issues that a pursuit policy must address, and subdivision (d) addresses training requirements." *Ramirez v. City of Gardena*, 14 Cal. App. 5th 811, 818 (2017).

While CHP argues that it "properly promulgated its [chase] policy pursuant to statute and *Ramirez I*," it does not explain how each of those requirements are met. I agree with plaintiffs that while it is possible a Section 17004.7 immunity question could be resolved before trial, "neither the face of the Complaint nor CHP's own [declaration] submission establishes the conditions on which section 17004.7 immunity depends." Oppo. at 12. Accordingly, CHP's motion to dismiss on this ground is DENIED.

United States District Court
Northern District of California

**C. Fourteenth Amendment + Bane Act**

CHP moves to dismiss plaintiffs' Bane Act claim because the Fourteenth Amendment does not provide any affirmative right to governmental aid. The parties again dispute whether the state-created danger exception applies. CHP argues that because "nothing [in the complaint] suggest[s] that the CHP's alleged conduct . . . rises to the level of shocking the conscience," there are no plausible allegations of deliberate indifference that would give rise to a state-created danger exception. CHP Mot. at 7. Plaintiffs respond by arguing that CHP's memorandum "never separately analyzes the Bane Act's elements and never addresses whether the conduct alleged in the Seventh Cause of Action satisfies section 52.1 on its own terms." CHP Oppo. at 17. "That gap matters," plaintiffs assert: "the Bane Act is a California statutory cause of action with its own elements, and CHP's conclusion that Plaintiffs lack a particular federal constitutional theory does not, standing alone, establish that section 52.1's separate state-law elements are absent." *Id.*

CHP's arguments with respect to the state-created danger exception appear to form the basis for why it also believes dismissal of the Bane Act claim is warranted. Even if this were not the case, plaintiffs have not alleged *any* conduct that would suggest that the CHP is connected to the crux of the Bane Act claim: that "defendants" (including the City of Oakland, OPD, CHP, and Does 1-100) failed to render timely and reasonable medical aid and instead exercised coercive police authority and control over Woodruff while she was injured. Plaintiffs must be more specific about the conduct each defendant engaged in and how Woodruff's injuries were a result of such conduct. CHP's motion to dismiss is GRANTED with leave to amend.

**CONCLUSION**

The events surrounding Dr. Boomer's death are tragic. Whether this case is meant to be in state court, or whether plaintiffs have identified the right parties to sue and can state a claim, is a question not adequately resolved by the allegations in the complaint. Plaintiffs must be more specific to pass the 12(b)(6) pleading threshold. For the reasons set forth above, Oakland and the CHP's motions to dismiss are GRANTED with leave to amend. Plaintiffs shall have twenty-one (21) days from this Order to file an amended complaint addressing the deficiencies identified

above.

**IT IS SO ORDERED.**

Dated: October 26, 2026

William H. Orrick
United States District Judge